```
┌─────────────────────────────┐
│ USDC SDNY                   │
│ DOCUMENT                    │
│ ELECTRONICALLY FILED        │
│ DOC #:_____        │
│ DATE FILED:___2|29|16       │
└─────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————————x

PRINCE DIVINE MESSIAH MUHAMMAD,

      Plaintiff,

      -against-                      No. 13 Civ. 6026 (CM)

NNAMDI MADUEKWE,

      Defendant.

———————————————————————————x

## MEMORANDUM DECISION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

McMahon, J.:


The Plaintiff, Prince Divine Messiah Muhammad, resides at Kirby Forensic Psychiatric Center ("Kirby"), a state psychiatric facility located on Wards Island in New York City. *See Muhammad v. Rabinowitz*, No. 11-Civ-2428, 2012 U.S. Dist. LEXIS 49163, at **1-2 (S.D.N.Y. Apr. 5, 2012). This is the fourth Section 1983 suit that Muhammad has filed in this Court in connection with his treatment at Kirby, and the second such suit that alleges the improper administration of psychotropic medication. The Defendant in this case, Dr. Nnamdi Maduekwe, formerly worked at Kirby and was Muhammad's treating psychiatrist during a portion of his time there. Dr. Maduekwe was not a party to any of Muhammad's previous lawsuits.

On October 15, 2015, this Court converted Dr. Maduekwe's motion to dismiss, filed on June 30, 2015, into a motion for summary judgment. Noting that Dr. Maduekwe's arguments "appear to have considerable force," I gave Mr. Muhammad until November 30, 2015 "to file competent evidence that would raise a genuine issue of material fact." Mr. Muhammad has

1

Copies mailed/faxed/handed to counsel on _2/29/16_

failed to do so. Although he belatedly submitted certain handwritten letters in opposition to Dr.

Maduekwe's motion,[1] there is no competent evidence to be found in those letters – only

conclusory allegations. I therefore grant Dr. Maduekwe's motion for summary judgment and

dismiss the case.

## BACKGROUND[2]

### The Parties

The Plaintiff, Prince Divine Messiah Muhammad, whose birth name is Richard McCary,

has been diagnosed as suffering from schizophrenia, paranoid type, and has been involuntarily

institutionalized as a result of having been found not responsible by reason of a mental disease or

defect in connection with certain felonies committed in 1979. Lawson Decl. Ex. B (Muhammad

7/16/2015 Tr.) at 54:19-22; Maduekwe Decl. ¶ 5; Lawson Decl. Ex. C. (Muhammad Retention

Order). The Defendant in this case, Dr. Nnamdi Maduekwe, formerly worked at Kirby and was

Muhammad's treating psychiatrist at Kirby from 2007 to December 2013. Maduekwe Decl. ¶ 3.

---

[1] I elected to treat three of Mr. Muhammad's letters (ECF Nos. 40, 43, & 44) as opposition
papers and directed Dr. Maduekwe's counsel to file a reply brief by February 4, 2016. *See* Order
Directing Response, dated January 19, 2016 (ECF No. 48).

[2] As used herein, "Lawson Decl." refers to the Declaration of Matthew J. Lawson, dated July 30,
2015, and "Maduekwe Decl." refers to the Declaration of Dr. Nnamdi Maduekwe, dated July 29,
2015. The Lawson Decl. attaches three exhibits. Exhibits A and B to the Lawson Decl. consist of
excerpts of Plaintiff Prince Divine Messiah Muhammad's deposition testimony from July 9, 2012
and July 16, 2015, respectively. Exhibit C is a July 15, 2015 order from the New York Supreme
Court regarding Muhammad's continued retention at Kirby Forensic Psychiatric Center. The
Maduekwe Decl. attaches two exhibits, Exhibits A and B, each of which consists of an excerpted
portion of Muhammad's clinical records from Kirby Forensic Psychiatric Center.

2

## Muhammad's Previous Involuntary Medication Lawsuit

Before commencing this action against Dr. Maduekwe, Muhammad filed a similar

Section 1983 suit against other personnel at Kirby, including certain physicians. *See Rabinowitz*,

2012 U.S. Dist. LEXIS 49163, at \*\*1-2. In his April 2011 complaint in that suit, Muhammad

alleged that he was forced to take various medications against his will, including the drugs

Fluphenazine and Seroquel. *See id.* at \*2 & n.2 (listing the alleged medications).

On October 11, 2011, the defendants filed a motion to dismiss, which Judge Baer granted

in part and denied in part. *Id.* at \*\*3, 19-20. In his decision on that motion, Judge Baer found,

*inter alia*, that Muhammad had pleaded sufficient facts to state a claim for the involuntary

administration of medication under the Due Process Clause of the Fourteenth Amendment. *Id.* at

\*\*12-13.

However, Muhammad's involuntary medication claim began to unravel as soon as he was

deposed. During his July 9, 2012 deposition in that prior action, Muhammad conceded that he

had been voluntarily taking his medications from 2007 up through the date of the deposition:

> Q.    And since the expiration of the order [regarding
>       medications] on August 10th, 2007, you have been
>       voluntarily taking your psychiatric medications; isn't that
>       correct?
>
> A.    I believe so.
>
> Q.    And you are not alleging that you have been medicated
>       over objection after the order expired on October 10th,
>       2007; isn't that correct?
>
> A.    I believe that's correct.
>
> Q.    And you are not alleging that you have been physically
>       forced by any of the defendants to take any medication
>       since the last state order authorizing involuntary medical
>       treatment of you expired on August 10th, 2007; isn't that
>       correct?

3

A.      I believe so.  Yes.

Lawson Decl. Ex. A (Muhammad 7/9/2012 Tr.) at 95:21-96:14.  Muhammad also testified

during the same deposition that nobody had ever physically restrained him to administer

medication during that time:

> Q.      . . . . [S]ince August 10, 2007, has anyone physically
> restrained you to force medication on you?
>
> A.      I don't think so, no.  I don't think so.  No.

*Id.* at 106:5-10.

Based on Muhammad's testimony and other evidence, Judge Baer granted summary

judgment in the defendants' favor.  In his January 4, 2013 summary judgment order, Judge Baer

found that:

> [Muhammad's] answers during his deposition are indicative of
> mental illness, and coupled with the court order [regarding
> medication] that expired in 2007, I have little reason to believe that
> he was medicated against his will without first having been afforded
> due process. Since that court order, Plaintiff has voluntarily taken
> his medication, which has been reduced in dosage at his request.

*Muhammad v. Rabinowitz*, No. 11 Civ. 2428, 2013 U.S. Dist. LEXIS 2953, at **2-3 (S.D.N.Y.

Jan. 4, 2013) (emphasis added).

**Muhammad's Treatment at Kirby**

Judge Baer's conclusion – that the undisputed evidence before him established that

Plaintiff took his medicine voluntarily – are consistent with Dr. Maduekwe's testimony that

Muhammad voluntarily took his medication during the entire time at issue here (2010-2013).

Maduekwe Decl. ¶ 12.  As Dr. Maduekwe has testified, the nurses at Kirby followed a consistent

routine on the occasions that a Kirby patient was offered – but declined to accept – psychiatric

medication on a given day.  Among other things, the nurse would document the refusal in a

4

"Progress Note" composed the same day. *See* Maduekwe Decl. ¶ 13. On most occasions, the

refusing patient's wishes would be respected – and the psychiatric medication would not be

administered that day. A patient would only be involuntarily medicated with psychiatric

medication under two special circumstances: (i) where Kirby had obtained a state court order

authorizing medication over objection; or (ii) where certain emergency circumstances existed.

Maduekwe Decl. ¶ 12. Neither of these circumstances applied with respect to Muhammad

during the time relevant here.

As Dr. Maduekwe has testified, the last court order authorizing Kirby to medicate

Muhammad over his objection expired in 2007. It was not necessary to seek any further orders

during the time that Dr. Maduekwe was Muhammad's treating psychiatrist. *See* Maduekwe

Decl. ¶ 12. There was also no need to administer emergency psychiatric medication to

Muhammad during this time. Clinical records show that Muhammad only declined to accept his

psychiatric medication on a discrete number of occasions during time period relevant here (2010-

2013). On each occasion that Muhammad was offered but refused a particular medication during

this time, his wishes were respected – and there was no involuntary administration. *Id.* ¶ 13. In

particular:

- Muhammad declined to accept his tri-weekly Fluphenazine (Prolixin) shot on

  only two occasions during the relevant time: July 29, 2012 and December 15,

  2013. Maduekwe Decl. ¶ 14 & Ex. A. There was no involuntary administration

  of the medication in connection with these two refusals. After the July 29, 2012

  refusal, Kirby personnel simply returned on a later day to "re-offer" the

  medication, which Muhammad accepted. *Id.* After Muhammad's December 15,

  2013 refusal, there were no further attempts to offer the Fluphenazine during the

remainder of the time Dr. Maduekwe was Muhammad's treating psychiatrist. *Id.*
¶ 14.

- Muhammad declined to take his prescribed dose of Quetiapine (Seroquel) on a
  series of days in late May and early June 2012.  Maduekwe Decl. ¶ 15 & Ex. B.
  Far from forcibly medicating Muhammad during this time period, Dr. Maduekwe
  again respected his patient's wishes.  *Id.*  A nurse's progress note reflects that,
  because Muhammad was "not compliant with" his Quetiapine, "it was
  discontinued by Dr. Maduekwe." *Id.*

Kirby's records contain no other notes indicating that Muhammad was offered, but

declined to accept, his psychiatric medication during 2010-2013 period.  Maduekwe Decl. ¶ 16.

## This Lawsuit

Muhammad filed this action in August 2013 – a few months after his lawsuit before

Judge Baer was dismissed. *See* Complaint, Docket No. 2.  After a protracted series of delays,

Muhammad served Dr. Maduekwe at his current place of employment in April 2015.  Like

Muhammad's previous lawsuit, this action seeks damages as a result of the allegedly improper

administration of medication.   Muhammad alleges in his complaint that Dr. Maduekwe "ordered

for me to[] take a needle" during the three years leading up to the filing of the complaint, i.e.,

2010 to 2013.  Complaint ¶ III (C).  Muhammad further alleges that Dr. Maduekwe "ordered"

such medication out of a desire to "punish me because I am a 'Black Muslim.'" *Id.*  Muhammad

asserts that he suffered harmful side effects as a result of the allegedly improper administration

of medication, and he attaches a printout to his complaint that purports to list certain alleged

"Fluphenazine Side Effects." *See id.* ¶¶ IV-V.

**Muhammad's Deposition in This Case**

Dr. Maduekwe's counsel deposed Muhammad at Kirby on July 16, 2015.  During that deposition, Muhammad told an elaborate story regarding the occasions in which he was medicated that contradicts virtually all of his previous testimony on the subject.  Among other things, Muhammad claimed that there has never been <u>any</u> instance from 1994 to the present in which he voluntarily took his psychiatric medication.  Lawson Decl. Ex. B (Muhammad 7/16/2015 Tr.) at 101:6-17.  Muhammad also claimed that (i) Dr. Maduekwe ordered him to be physically restrained to be medicated against his will "at least 10, 15 times," *id.* at 125:25-126:10, (ii) on every one of these 10 to 15 occasions Muhammad told the Kirby staff that he did not want the medication, *id.* at 134:13-20; and (iii) there was never any occasion in which the Kirby staff respected his wishes after hearing such a refusal.  *Id.* at 140:13-19.  Instead, Muhammad claimed that on every single instance in which he refused to accept an injection containing psychiatric medication, his wishes were ignored, and he was thereafter restrained and given the medication against his will.  *Id.* at 140: 20-25.

Muhammad also made the remarkable claim that there were "like a hundred" staff members holding him down during the times he was physically restrained – at least one of whom weighed "600 pound[s]."  *Id.* at 120:23-121:21. While such occurrences would obviously be memorable, Muhammad was unable to identify a single staff member who was present during the times he claims he was physically restrained.  *See id.* at 126:11-127:3.  Moreover, Muhammad conceded that there is no evidence to support his new story outside his pleading itself:

> Q.  And is it also true that there is no evidence that Dr. Maduekwe ever ordered you to be medicated against your will, other than what is in this complaint?

A.    Yes.

*Id.* at 173:24-174:4.

With respect to his allegation that Dr. Maduekwe had ordered psychiatric medication in order to "punish" a Black Muslim, Muhammad admitted that there were in fact other reasons why the medication was prescribed:

> Q.    Are you claiming that the only reason Dr. Maduekwe
>       instructed you to take the Prolixin was because you are a
>       Black Muslim?
>
> A.    That's not the only reason.  That's just one reason. That's
>       not the only reason.

*Id.* at 162:24-163:6.

According to Muhammad, Dr. Maduekwe told him that the Prolixin (Fluphenazine) was prescribed because Muhammad was a "schizophrenic paranoid-type" and the Prolixin would help with his symptoms. *Id.* at 163:7-164:5.  In fact, Muhammad testified that this was "how he justified giving me all the dope medication he was giving me." *Id.*  Moreover, Dr. Maduekwe told Muhammad that the psychiatric medication "was going to help me.  That it was to my benefit to take it." *Id.* at 164:6-9.

Muhammad also conceded that, to the extent other Kirby patients received better treatment than Muhammad, this was not because of their religion. *See id.* at 175:20-22.  Indeed, after initially claiming that Dr. Maduekwe treated "[e]verybody in the ward . . . better than me," Muhammad thereafter admitted there were "a lot of people" – none of whom were Black Muslims – that Dr. Maduekwe treated "the same way he treated me." *Id.* at 175-20:176:07.

8

## DISCUSSION

### I.    Standard

Summary judgment must be granted if there is no genuine issue as to any material fact

and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Savino v.*

*City of New York*, 331 F.3d 63, 71 (2d Cir. 2003). Summary judgment is not a "disfavored

procedural shortcut," but is an integral part of the Federal Rules' goal of securing the "just,

speedy and inexpensive determination of every action." *See Celotex Corp. v. Catrett*, 477 U.S.

317, 327 (1986). In order to avoid summary judgment, the nonmoving party must do more than

show "some metaphysical doubt" as to the material facts. Rather, the nonmoving party must

come forward with admissible evidence sufficient to raise a genuine issue of fact, and may not

rely upon speculation or conjecture. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 586 (1986); *Savino*, 331 F.3d at 71. In order to raise a genuine issue of fact, the evidence

must be such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Furthermore, "issues of credibility sufficient to defeat a motion for summary judgment

are not created if the contradicting or impeaching evidence is too incredible to be believed by

reasonable minds." *Schmidt v. Tremmel*, No. 95-Civ-8588, 1995 U.S. Dist. LEXIS 97, 10

(S.D.N.Y. Jan. 4, 1995) (quoting *Price v. Worldvision Enterprises, Inc.*, 455 F. Supp. 252, 266

n.25 (S.D.N.Y. 1978), *aff'd without opinion*, 603 F.2d 214 (2d Cir. 1979)); *see also Jeffreys v.*

*City of New York*, 426 F.3d 549, 555 (2d Cir. 2005).

## II.     Summary Judgment Dismissing Muhammad's Involuntary Administration of Medication Claim is Granted

Muhammad alleges that Dr. Maduekwe ordered him to "take a needle every month" for the three years leading up to the filing of the complaint, i.e., 2010 through 2013. Complaint ¶ III(C). Muhammad claims that he suffered harmful side effects as a result. He attaches to his complaint a one-page internet printout listing potential "Fluphenazine Side Effects." See Complaint ¶¶ IV-V. Viewed in the light most favorable to Muhammad, these allegations suggest an attempt to plead a claim for involuntary administration of medication under *Washington v. Harper*, 494 U.S. 210, 221-22 (1990), which recognizes that persons confined by the state have an "interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment."[3]

Muhammad's involuntary administration of medication claim is barred in part under the doctrine of collateral estoppel. Judge Baer's findings from the prior lawsuit defeat an essential element of that claim – namely, involuntariness. *See, e.g., Morgan v. Rabun*, 128 F.3d 694, 700 (8th Cir. 1997) (finding that there was "was no constitutional violation because the record shows that Morgan voluntarily took his medication."). As Judge Baer's order establishes, Muhammad "voluntarily" took his medication at Kirby from 2007 to at least January 4, 2013 (the date of Judge Baer's order).

---

[3] Although Muhammad elsewhere uses the phrase "cruel and unusual punishment," see Complaint ¶ II (B), federal case law makes clear that his allegations should be analyzed under the Due Process Clause – and not the Eighth Amendment. *See Lombardo v. Holanchock*, No. 07-Civ-8674, 2008 U.S. Dist. LEXIS 48753, at *26 (S.D.N.Y. June 25, 2008) (stating that the Eighth Amendment "does not apply to one who has been civilly committed. By its terms, the Eighth Amendment applies only to 'punishment,' and as 'an insanity acquittee . . . was not convicted, he may not be punished.'") (quoting *Jones v. United States*, 463 U.S. 354, 369 (1983)).

10

Citing Muhammad's deposition in that case, "coupled with a court order [regarding medication] that expired in 2007," Judge Baer reasoned that "I have little reason to believe that he was medicated against his will without first having been afforded due process. Since that court order, Plaintiff has voluntarily taken his medication." *Rabinowitz*, 2013 U.S. Dist. LEXIS 2953, at **2-3 (emphasis added). This holding – predicated on undisputed evidence and never overturned on appeal – is binding on Muhammad.

Under the law of this circuit, a party is collaterally estopped from raising an issue if:

> (1) the identical issue was raised in a previous proceeding; (2) the issue
> was actually litigated and decided in the previous proceeding; (3) the party
> had a full and fair opportunity to litigate the issue; and (4) the resolution of
> the issue was necessary to support a valid and final judgment on the merits.

*Overview Books, LLC v. United States*, 438 F. App'x 31, 33 (2d Cir. 2011) (quoting

*Interoceanica Corp. v. Sound Pilots, Inc.*, 107 F.3d 86, 91 (2d Cir. 1997)).

All four elements are met here. First, it is clear that Muhammad "actually litigated" his involuntary medication claim in the prior proceeding. As Judge Baer stated in his decision on the motion to dismiss, "Plaintiff allege[d] that he was given numerous medications over his express objection" while at Kirby – including Fluphenazine, the only drug at issue here. *Rabinowitz*, 2012 U.S. Dist. LEXIS 49163 at *11; *see also id.* at 2 n.2. It is also clear that Muhammad had a full and fair opportunity to litigate the issue. Indeed, as Judge Baer's decisions make clear, Muhammad's involuntary administration of medication claim was litigated all the way through summary judgment. Finally, since Muhammad's decision to take the medication voluntarily was sufficient to defeat his claim, the relevant factual finding was clearly "necessary to support a valid and final judgment on the merits." *See Overview Books*, 438 F. App'x at 33.

11

The fact that Dr. Maduekwe was not a party to the earlier lawsuit before Judge Baer does not defeat the application of collateral estoppel. As the Supreme Court recognized in *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 329 (1979), mutuality of parties is not required for the application of defensive collateral estoppel. *See also Wilder v. Thomas*, 854 F.2d 605, 621 (2d Cir. 1988) (noting that "[m]utuality of estoppel is no longer an essential part of [the] collateral estoppel doctrine" and reasoning that it was therefore "appropriate to allow the state and city defendants to invoke defensive collateral estoppel even though they were not parties to the state court proceeding."); *accord Carino v. Deerfield*, 750 F. Supp. 1156, 1170 (N.D.N.Y 1990) (defendants who were not parties to first proceeding could still invoke defensive collateral estoppel because mutuality of parties is no longer required). Indeed, as long as the plaintiff "had an opportunity to fully and fairly litigate an issue and lost," then even "third parties unrelated to the original action can bar the [plaintiff] from relitigating that same issue in a subsequent suit." *Austin v. Downs, Rachlin & Martin*, 114 F. App'x 21, 22 (2d Cir. 2004). As the Second Circuit reasoned in *Wilder*, "[t]he central question is whether the plaintiffs have had their day in court, and the answer here is 'yes'." 854 F.2d at 621.

Moreover, Judge Baer held that Muhammad was not forced to take his medication *while he was at Kirby*, and Dr. Maduekwe was employed at Kirby during the time period covered by that decision. Judge Baer's holding, therefore, inherently includes any actions taken by Dr. Maduekwe in his care of Muhammad, despite the fact that Dr. Maduekwe was not a named defendant in that case.

On October 15, 2015, I directed Mr. Muhammad to "respond with evidence" to the

argument that "Judge Baer's decision . . . collaterally estops [Mr. Muhammad] from bringing a

claim for involuntary administration of medication that occurred prior to January 4, 2013." Oct.

15 Order at 2. Mr. Muhammad has not provided any such evidence. In fact, Mr. Muhammad's

opposition papers do not even mention the collateral estoppel issue or Judge Baer's January 4,

2013 decision.

While Judge Baer's order does not address the time period after January 4, 2013,

Muhammad offers no competent evidence suggesting that he thereafter changed his mind about

his willingness to voluntarily take the medication.

Thus, even if Mr. Muhammad's involuntary medication claim were not barred under

the doctrine of collateral estoppel, summary judgment dismissing the claim would be

appropriate because the evidence in this case – including Mr. Muhammad's 2012 testimony

from the *Rabinowitz* action, Judge Baer's 2013 findings, Dr. Maduekwe's affidavit testimony,

and Kirby's records – demonstrates that Mr. Muhammad was never involuntarily medicated

during the time period at issue in this case. After reviewing this evidence, I directed Mr.

Muhammad to "file competent evidence that would raise a genuine issue of material fact" in

support of his contrary allegation. Oct. 15 Order at 2. Mr. Muhammad has not done so.

In fact, Mr. Muhammad rarely mentions Dr. Maduekwe in his opposition papers, and

when he does so, he simply asserts in a conclusory fashion that Dr. Maduekwe (i) violated his

constitutional rights and/or (ii) wrongfully called him a paranoid schizophrenic. *See, e.g.*, ECF

No. 40 at 2 (claiming that "Maduekwe violated my constitutional rights," but failing to

provide any further details); ECF No. 43 at 1(asserting that "they" [sic] "owe me" for the

violation of certain unidentified rights); ECF No. 44 (claiming, without further explanation,

that the "defendants" [sic] disrespected Mr. Muhammad's constitutional rights). These

statements are wholly insufficient to raise a genuine issue of material fact. On summary

judgment, the "non-moving party may not rely on mere conclusory allegations . . . but instead

must offer some hard evidence showing that its version of the events is not wholly fanciful."

*D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998).

The only purported "evidence" that could even conceivably support Mr. Muhammad's

revisionist version of the facts is his July 16, 2015 deposition testimony. But that testimony is

"so replete with inconsistencies and improbabilities" that no reasonable juror could possibly

believe it. *See Jeffreys*, 426 F.3d at 555. Indeed, this Court specifically directed Mr.

Muhammad to "respond with evidence to the State's argument[] . . . that the deposition

testimony he gave in this action on July 16, 2015 fails to raise a genuine issue of material fact,

because it contradicts his testimony in *Rabinowitz* (which he now denies giving) and is so

fanciful as to be inherently implausible." Oct 15 Order at 2 (quoting *Jeffreys*, 426 F. 3d at

555). Mr. Muhammad did not provide any such evidence; indeed, he does not even mention

his 2015 deposition in his opposition papers. As such, Mr. Muhammad's testimony also fails

to raise a fact issue sufficient to defeat summary judgment.

Summary judgment dismissing the involuntary administration of medication claim is

granted.


**III.    Summary Judgment Dismissing Plaintiff's Equal Protection Claim is Granted**

Muhammad also claims that Dr. Maduekwe acted with discriminatory animus when he

administered medication to Muhammad. Specifically, Muhammad asserts that Dr. Maduekwe

14

chose to medicate him out of a desire to "punish me because I am a Black Muslim." Complaint ¶ III (C).

Viewed in the light most favorable to Muhammad, these allegations can be construed as an attempt to state a claim for the denial of equal protection. The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws," which is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

The Second Circuit has recognized several ways for a plaintiff to plead intentional discrimination in violation of the Equal Protection Clause, and there are three such theories that Muhammad may attempt to rely on here.

First, Muhammad could attempt to invoke the selective enforcement/selective treatment theory recognized in *Le Clair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980), which applies where (1) "the [plaintiff] compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure [the plaintiff]." *See also Kajoshaj v. N.Y. City Dep't of Educ.*, 543 F. App'x 11, 15 (2d Cir. 2013).

Second, Muhammad could attempt to rely on the analogous "class of one" theory discussed in *Willowbrook v. Olech*, 528 U.S. 562, 564 (2000), which applies " where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."

Third, Muhammad could attempt to invoke *Pyke v. Cuomo*, 258 F.3d 107, 110 (2d Cir. 2001), which applies, *inter alia*, where the plaintiff "alleges that a facially neutral law or policy

has been applied in an intentionally discriminatory race-based manner, or that a facially neutral

statute or policy with an adverse effect was motivated by discriminatory animus."

However, Muhammad offers no competent evidence of a constitutional violation under

any of these theories.

### A. There Is No Genuine Dispute as to Whether Muhammad's Rights Were Violated under the  Selective Treatment or "Class of One" Theories

An equal protection plaintiff relying on either the selective enforcement/selective

treatment or the "class of one" theories must plead and prove that he was treated differently from

other similarly situated individuals. *See Le Clair*, 627 F.2d at 609-10; *Rankel v. Town of Somers*,

999 F. Supp. 2d 527, 545 (S.D.N.Y. 2014).  Muhammad has not pleaded that he was treated

differently than other Kirby patients who were not Black Muslims, and there is no legally

sufficient evidence that he was.  In fact, Muhammad testified that, to the extent other Kirby

patients received better treatment, this was not because of their religion. *See* Lawson Decl. Ex. B

(Muhammad 7/16/2015 Tr.) at 175:20-22.  After initially claiming that Dr. Maduekwe treated

"[e]verybody in the ward . . . better than me," *id.* at 175:10-16, Muhammad admitted that the

facts were to the contrary.  In particular, Muhammad now concedes that there were "a lot of

people" that Dr. Maduekwe treated "the same way he treated me" – even though Muhammad

was the only Black Muslim in the facility. *Id.* at 175:20-176:18.  Muhammad's equal protection

claim can be dispensed with based on these concessions alone.

Additionally, no competent evidence suggests that Dr. Maduekwe singled Muhammad

out for special punishment simply because he was a Black Muslim.  As to Muhammad's

conclusory allegation that Dr. Maduekwe prescribed psychotropic medication to Muhammad out

of the desire to "punish" a Black Muslim, that story is too fantastical to survive *Iqbal*'s

16

plausibility test, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678-80 (2009), let alone create a genuine issue of material fact as to whether Muhammad's Fourteenth Amendment rights were violated. There are many plausible, nondiscriminatory reasons that explain why a psychiatrist at a state psychiatric hospital might want to administer psychotropic medication to a patient. Dr. Maduekwe testified that the psychiatric medications were prescribed to treat Muhammad's psychiatric symptoms related to his dangerous mental disorder, lack of insight into his mental illness, substance abuse problems and his risk factors for dangerousness. Maduekwe Decl. ¶ 20. Muhammad admitted at his own deposition that there were factors having nothing to do with his ethnicity or religion that led to the decision to administer psychiatric medication. In particular, Muhammad now claims that his status as a Black Muslim was "just one reason" he was instructed to take Prolixin (i.e., Fluphenazine). Lawson Decl. Ex. B (Muhammad 7/16/2015 Tr.) at 162:24-163:6. Muhammad admitted that Dr. Maduekwe explained the medication was being prescribed to treat the symptoms of schizophrenia. *Id.* at 163:7-164:21.

During his July 2015 deposition, Muhammad offered an additional story about Dr. Maduekwe's alleged animus against Black Muslims. According to Muhammad "[h]e [Maduekwe] said I wasn't going to never get out of here as long as I'm a black Muslim." Lawson Decl. Ex. B (Muhammad 7/16/2015 Tr.) at 165:22-166:6. But it is undisputed that the reason Muhammad continues to reside at Kirby is that the New York Supreme Court continues to conclude that he suffers from a dangerous mental disorder warranting further institutional care. *See* Maduekwe Decl. ¶ 21; Lawson Decl. Ex. C (Muhammad Retention Order). In fact, as Muhammad testified, his most recent retention hearing regarding occurred on July 15, 2015 – one day before his deposition. Lawson Decl. Ex. B (Muhammad 7/16/2015 Tr.) at 56:21-24. Muhammad acknowledged that the hearing gave him the opportunity to persuade the state court judge that he

17

no longer suffers from a dangerous mental disorder – a finding that would have allowed

Muhammad to be transferred out of Kirby. *Id.* at 57:15-58:18. However, the court concluded that

Muhammad in fact continues to suffer from a dangerous mental disorder and ordered that he be

retained. *Id.* at 58:23-59:3, 56:25-57:8; Lawson Decl. Ex. C (Muhammad Retention Order).

Given Muhammad's lack of mental competence, there is no competent evidence that Dr.

Maduekwe ever made any negative comments about Muhammad's status as a Black Muslim.

Muhammad admitted that no other witnesses were in the room when Dr. Maduekwe allegedly

made such remarks. *Id.* at 172:12-16. He also admitted that he never wrote down any such remarks

after Dr. Maduekwe allegedly said them. *Id.* at 172:24-173:4. In fact, Muhammad went so far as

to concede that there is no evidence outside the pleadings that any such remarks were ever made

in the first instance:

> Q.     So, there is no evidence that Dr. Maduekwe ever said
>        anything about your being a Black Muslim, beyond what is
>        written in your complaint?
>
> A.     Right. Everything is down there is what happened.

*Id.* at 173:18-23. Significantly, the Complaint does not mention any alleged remark about

retaining Muhammad at Kirby as long as he continued to be a Black Muslim. *See* Complaint.

## B.     There Is No Genuine Dispute as to Whether Muhammad's Rights Were Violated Under the Equal Protection Theory Recognized in *Pyke v. Cuomo*

The Second Circuit's decision in *Pyke v. Cuomo*, 258 F.3d 107, 110 (2d Cir. 2001), sets

forth certain narrow, limited grounds on which an equal protection plaintiff is relieved of the

requirement to demonstrate that a similarly situated group of individuals was treated differently.

Specifically:

> . . . a plaintiff who . . . alleges an express racial classification, or
> alleges that a facially neutral law or policy has been applied in an

18

> intentionally discriminatory race-based manner, or that a facially neutral statute or policy with an adverse effect was motivated by discriminatory animus, is not obligated to show a better treated, similarly situated group of individuals of a different race in order to establish a claim of denial of equal protection.

*Id.* Muhammad does not allege an express classification of the type contemplated by the Second Circuit – i.e., an express classification within a "law or policy." *See Brown v. City of Oneonta,* 221 F.3d 329, 337 (2d Cir. 1999). Muhammad also does not complain about the enactment or application of any facially neutral law or policy. Indeed, no law or policy of any kind is identified in Muhammad's complaint or deposition. Instead, Muhammad's allegations relate entirely to the individual treatment decisions made by a single doctor – Dr. Maduekwe. As such, Muhammad's allegations fall outside the narrow confines of the *Pyke* court's holding. In any event, for all the reasons discussed above, the evidence adduced in this case is wholly insufficient to create a fact issue as to whether any intentional discrimination or discriminatory animus ever existed.

In sum, the evidence in the record is insufficient to create a genuine dispute as to the existence of any constitutional violation.

19

## CONCLUSION

For the foregoing reasons, Dr. Maduekwe's motion for summary judgment is granted.

The Clerk of the Court is directed to remove Docket No. 20 from the Court's list of pending

motions and to close the file.


Dated: February 29, 2016

_____
U.S.D.J.

BY ECF TO ALL COUNSEL